Case No. 26-1309

---

# UNITED STATES COURT OF APPEALS

# FOR THE FOURTH CIRCUIT

---

SANDOZ INC.,
*Plaintiff-Appellant,*

v.

AMGEN INC., AMGEN MANUFACTURING LIMITED LLC, IMMUNEX CORPORATION,
*Defendants-Appellees.*

---

On Appeal from the Order Dismissing Complaint by
the U.S. District Court for the Eastern District of Virginia
Case No. 2:25-cv-218-AWA-RJK

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT SANDOZ INC.

---

Matthew D. Kent
Troy A. Stram
Karla M. Doe
**ALSTON & BIRD LLP**
1201 West Peachtree St.
Atlanta, GA 30309
(404) 881-7000
matthew.kent@alston.com
troy.stram@alston.com
karla.doe@alston.com

*Counsel for Appellant Sandoz Inc.*

## CORPORATE DISCLOSURE STATEMENT

Sandoz Inc. is a wholly owned subsidiary of Sandoz AG. Sandoz Inc. is an indirect subsidiary of Sandoz Group AG. Sandoz Group AG's shares are listed and traded on the SIX Swiss exchange under the ticker symbol SDZ, and its American Depository Receipts trade on OTCQX under the symbol SDZNY. Sandoz AG is not publicly traded. No other publicly held corporation owns 10% or more of Sandoz Inc.'s stock.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF ISSUES PRESENTED....................................................1

STATEMENT OF THE CASE...................................................................2

FACTUAL BACKGROUND.......................................................................5

    I.     Amgen acquires and maintains a monopoly in the U.S. etanercept market. ...................................................................5

    II.    Amgen sues Sandoz for patent infringement in 2016. .........7

    III.   Sandoz sues Amgen for illegally maintaining its monopoly over the U.S. etanercept market in 2025. ....................................9

SUMMARY OF ARGUMENT ..................................................................12

STANDARD OF REVIEW ......................................................................14

ARGUMENT .........................................................................................15

    I.     The District Court Improperly Applied The Supreme Court's Holding in *Mercoid*. ..........................................................15

        A.    The Supreme Court's binding *Mercoid* decision requires finding that Sandoz's antitrust claim is a permissive counterclaim.................................................15

        B.    The district court's effort to cabin *Mercoid* relied on erroneous understandings of both prior Fourth Circuit precedent and Sandoz's antitrust claim. ...................17

        C.    The district court further erred by overriding crucial policy considerations *Mercoid* advances. ................25

    II.    Sandoz's Section 2 Claim Is Not A Compulsory Counterclaim.........30

        A.    The district court improperly relied solely on Sandoz's obviousness-type double patenting defense when applying Rule 13(a)..................................................30

        B.    This Circuit's four inquiries all support finding that Sandoz's antitrust claim was not a compulsory counterclaim..................................................33

CONCLUSION......................................................................................40

STATEMENT REGARDING NECESSITY OF ORAL ARGUMENT.................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agrashell, Inc. v. Hammons Prods. Co.*,
 479 F.2d 269 (8th Cir. 1973) ..................................................................16

*Am. Equip. Corp. v. Wikomi Mfg. Co.*,
 630 F.2d 544 (7th Cir. 1980) ..................................................................22

*Amphastar Pharmas., Inc. v. Momenta Pharmas, Inc.*,
 297 F. Supp. 3d 222 (D. Mass 2018)......................................................17

*Audio MPEG, Inc. v. Dell Inc.*,
 254 F. Supp. 3d 798 (E.D. Va. 2017) ...............................................26, 39

*Azurity Pharmas., Inc. v. Bionpharma Inc.*,
 650 F. Supp. 3d 269 (D. Del. 2023).........................................26, 28, 29

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007).................................................................................26

*Burlington Industries v. Milliken & Co.*,
 690 F.2d 380 (4th Cir. 1982) ...........................................................passim

*CareFirst of Md., Inc. v. Amgen, Inc.*,
 No. 24-cv-484-AWA (E.D. Va. Sept. 30, 2025) ...............................9, 10

*CareFirst of Md., Inc. v. Amgen, Inc.*,
 No. 26-1473 (4th Cir.) .............................................................................10

*Clodfelter v. Republic of Sudan*,
 720 F.3d 199 (4th Cir. 2013) ..................................................................37

*Critical-Vac Filtration Corp. v. Minuteman International, Inc.*,
 233 F.3d 697 (2nd Cir. 2000) .........................................21, 22, 24, 27

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
 637 F.3d 435 (4th Cir. 2011) ..................................................................12

*Ethicon, Inc. v. Quigg*,
 849 F.2d 1422 (Fed. Cir. 1988) ............................................................26

*Fowler v. Sponge Prods. Corp.*,
 246 F.2d 223 (1st Cir. 1957)................................................................16

*Frank N. Magid Assocs., Inc. v. Marrs*,
 No. 16-CV-198, 2017 WL 3097257 (N.D. Iowa July 20, 2017)........................32

*FTC v. Actavis, Inc.*,
 570 U.S. 136 (2013).........................................................................25

*Gloucester T'ship Bd. Educ. v. E.N. ex rel. A.N.*,
 No. 22-cv-6568, 2025 WL 2926831 (D.N.J. Feb. 21, 2025)............................32

*Go Comput., Inc. v. Microsoft Corp.*,
 508 F.3d 170 (4th Cir. 2007) ...............................................................28

*Hydranautics v. FilmTec Corp.*,
 70 F.3d 533 (9th Cir. 1995) ............................................................passim

*Immunex Corp. v. Sandoz Inc.*,
 395 F. Supp. 3d 366 (D.N.J. 2019)....................................................7, 38

*Immunex Corp. v. Sandoz Inc.*,
 964 F.3d 1049 (Fed. Cir. 2020) ......................................................passim

*Immunex Corp. v. Sandoz Inc.*,
 No. 16-cv-1118, 2018 WL 7254681 (D.N.J. Aug. 20, 2018)............................7

*In re Hubbell*,
 709 F.3d 1140 (Fed. Cir. 2013) .............................................................8

*In re Innotron Diagnostics*,
 800 F.2d 1077 (Fed. Cir. 1986) .......................................................25, 39

*King v. Rubenstein*,
 825 F.3d 206 (4th Cir. 2016) ................................................................5

*Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*,
 995 F.3d 123 (4th Cir. 2021) ...............................................................35

v

*Mercoid Corp. v. Mid-Continent Inv. Co.*,
    320 U.S. 661 (1944)................................................................passim

*Nasalok Coating Corp. v. Nylok Corp.*,
    522 F.3d 1320 (Fed. Cir. 2008) ........................................................31

*P & M Servs., Inc. v. Gubb*,
    No. 07-cv-12816, 2008 WL 4185903 (E.D. Mich. Sept. 8, 2008).....................16

*Painter v. Harvey*,
    863 F.2d 329 (4th Cir. 1988) .........................................14, 32, 33, 38

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) ...........................................................20

*Peter Farrell Supercars, Inc. v. Monsen*,
    82 F. App'x 293 (4th Cir. 2003) .......................................................12

*Regeneron Pharmas., Inc. v. Amgen Inc.*,
    No. 1:22-cv-00697 (D. Del. June 2, 2025) .........................................22

*Roberts v. Carter-Young, Inc.*,
    131 F.4th 241 (4th Cir. 2025) .........................................................12

*Stanback v. Robertson*,
    183 F.2d 889 (4th Cir. 1950) ..........................................................17

*Tank Insulation Int'l, Inc. v. Insultherm, Inc.*,
    104 F.3d 83 (5th Cir. 1997) ........................................................16, 23

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
    581 U.S. 258 (2017)....................................................................28

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ...........................................................35

*Va. Polytechnic Inst. & St. Univ. v. Hokie Real Est., Inc.*,
    813 F. Supp. 2d 745 (W.D. Va. 2011)...............................................32

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965)....................................................................24

*Williams v. Long*,
558 F. Supp. 2d 601 (D. Md. 2008) ........................................................ 35

*Xerox Corp. v. SCM Corp.*,
576 F.2d 1057 (3d Cir. 1978) ................................................................. 28

*Zero Techs., LLC v. Clorox Co.*,
713 F. Supp. 3d 40 (E.D. Pa. 2024) ................................................. passim

**RULES**

Federal Rule of Appellate Procedure 4(a) ................................................. 1

Federal Rule of Appellate Procedure 34(a) ............................................. 40

Federal Rule of Civil Procedure 13 .......................................... 16, 23, 40

Federal Rule of Civil Procedure 13(a) ............................................. passim

Federal Rule of Civil Procedure 13(b) ............................................ passim

Federal Rule of Civil Procedure 42(b) ..................................... 26, 27, 39

**STATUTES**

15 U.S.C. § 22 ........................................................................................ 28

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 1337(a) ................................................................................. 1

28 U.S.C. § 1367(a) ................................................................................. 1

Sherman Act, 15 U.S.C. § 1, *et seq.* ...................................... 11, 24, 34

Sherman Act, 15 U.S.C. § 2 .............................................................. passim

## JURISDICTIONAL STATEMENT

The district court exercised subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question jurisdiction), 1337(a) (antitrust enforcement), and 1367(a) (supplemental jurisdiction) because Sandoz Inc. ("Sandoz") alleged a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and brought related state-law claims. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because Sandoz appeals from the district court's order granting Amgen's motion to dismiss Sandoz's complaint.

The district court entered its order and judgment dismissing the action on February 17, 2026. JA001–002. Sandoz timely filed its notice of appeal on March 13, 2026, within the 30-day period set forth in Federal Rule of Appellate Procedure 4(a). JA317. This appeal is from a final order and judgment that disposes of all parties' claims.

## STATEMENT OF ISSUES PRESENTED

I.     Whether the district court erred in finding that Sandoz's antitrust claim under Section 2 of the Sherman Act was a compulsory counterclaim under Federal Rule of Civil Procedure 13(a) that must have been litigated in response to Amgen's prior patent infringement suit.

1

## STATEMENT OF THE CASE

Appellees Amgen Inc., Amgen Manufacturing Ltd. LLC, and Immunex Corp. (collectively, "Amgen") have maintained a monopoly in the U.S. market for etanercept for a decade longer than the statutory, 20-year exclusivity period afforded by U.S. patent law. Amgen achieved this perverse result by unlawfully acquiring patent rights from Hoffman-La Roche Inc. ("Roche") and blocking Sandoz and others from commercializing less expensive biosimilars that would compete with Amgen's branded etanercept drug, ENBREL®, and save patients and the U.S. healthcare system billions of dollars.

In April 2025, Sandoz filed a detailed, 64-page complaint against Amgen alleging that Amgen violated, *inter alia*, Section 2 of the Sherman Act by acquiring the '182 and '522 patents to extend its monopoly in the U.S. etanercept market until 2029. JA041–108, JA250–288. The district court dismissed Sandoz's complaint for one reason: Sandoz, in the court's view, was required to bring its ***antitrust*** claim against Amgen as a compulsory counterclaim in response to Amgen's ***patent infringement*** claims against Sandoz. JA018. In so holding, the lower court misapplied binding U.S. Supreme Court authority, misapprehended the substance of the parties' prior litigation, and laid the foundation for an unworkable system where complex antitrust and patent infringement claims must be tried in the same action despite clear directives from Congress to avoid doing so.

2

Federal Rule of Civil Procedure 13(a) makes compulsory any counterclaim that a party has "at the time of its service" if the counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." The U.S. Supreme Court has expressly held that an antitrust claim for damages "is a separate statutory cause of action" that must be considered a ***permissive*** counterclaim that "might have been asserted . . . in the prior suit by reason of Rule 13(b)." *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 671 (1944). Notwithstanding that binding Supreme Court authority, the lower court applied this Circuit's four inquiries for identifying a compulsory counterclaim and rejected application of the *Mercoid* "exception" to the compulsory counterclaim rule. JA024–031. Whether considered as an exception to Rule 13(a) or as part of this Circuit's four compulsory counterclaim inquiries, the Supreme Court's holding in *Mercoid* compels a single result—reversal of the lower court's decision.

The lower court's ruling is wrong as a matter of law and policy. Congress has "designate[d] different paths for patent and antitrust law": (i) the Federal Circuit handles all appeals from patent infringement decisions whereas appeals from antitrust decisions typically go to the regional circuit in which the district court sits; (ii) trial courts routinely bifurcate or sever patent and antitrust claims for purposes of trial; and (iii) Congress's venue statute for patent claims is far narrower than the expansive venue provision for antitrust claims. *Zero Techs., LLC v. Clorox Co.*, 713

3

F. Supp. 3d 40, 68–69 (E.D. Pa. 2024). By finding that Sandoz must have brought its antitrust claim in response to Amgen's patent infringement claim, the lower court has upset "the policy balance Congress struck between patent and antitrust actions." *Id.* at 69. This Court should reverse the lower court's dismissal of Sandoz's antitrust claim.

## FACTUAL BACKGROUND

### I.     AMGEN ACQUIRES AND MAINTAINS A MONOPOLY IN THE U.S. ETANERCEPT MARKET.[1]

After successfully prosecuting several patents covering etanercept, Immunex launched its branded etanercept drug, ENBREL®, in 1998 with FDA approval for the treatment of rheumatoid arthritis. JA065–067. In parallel to Immunex's research, Roche also made similar breakthroughs and filed several patent applications in Europe and the United States that covered etanercept. JA063–064. Critically, two of those patent applications were filed in May 1995, just before the Uruguay Round Agreements of the General Agreement on Tariffs and Trade ("GATT") took effect. JA081. For the patents that ultimately issued from those two applications, their term would last for either 20 years from the application filing date *or* 17 years from the date of patent issuance. JA081. After launching ENBREL®, Immunex obtained a retroactive, co-exclusive license to Roche's patent rights related to etanercept, including the two applications filed in May 1995, which Immunex needed to continue selling ENBREL® in the United States. JA067–068.

Upon witnessing the success of ENBREL®, Amgen acquired Immunex in

---

[1] The factual background is drawn from the well-pleaded allegations in the Complaint, which, for purposes of this appeal, must be accepted as true. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) ("In reviewing a dismissal for failure to state a claim, we accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.").

December 2001 and obtained a monopoly over the U.S. etanercept market. JA070. To ward off competition following the anticipated expiration of the Immunex patents covering etanercept, Amgen sought further control over Roche's overlapping etanercept patent rights. JA074–075. In 2004, Amgen and Roche entered an agreement titled "Accord & Satisfaction" (the "2004 Exclusive License") whereby Amgen paid Roche $150 million in exchange for Roche agreeing to waive future royalty payments to which it was entitled under its 1998 co-exclusive license with Immunex. JA075–076. Roche further granted Amgen both a paid-up, irrevocable, and exclusive license to its overlapping etanercept patent rights and the right to prosecute, *inter alia*, the May 1995 patent applications in the United States. JA076. Roche, however, retained certain rights in its etanercept patents and patent applications, including the rights to conduct internal, non-clinical research; to sue if Amgen failed to rectify infringement or initiate an action for patent infringement within 180 days after written notification by Roche; and to veto the assignment of Immunex's interest under the agreement to any unrelated party. JA076–077; *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1061 (Fed. Cir. 2020).

Amgen took seven years to prosecute the two May 1995 Roche patent applications, which ultimately issued as U.S. Patent No. 8,063,182 ("the '182 Patent") on November 22, 2011, and U.S. Patent No. 8,163,522 ("the '522 Patent") on April 24, 2012. JA081–082. Because these two patents resulted from applications

6

filed before GATT, they have a term of 17 years following issuance—*i.e.*, expiring in 2028 and 2029, respectively. As a result, Immunex and its successor, Amgen, obtained a three-decade monopoly over the U.S. etanercept market. *Id.*

## II.    AMGEN SUES SANDOZ FOR PATENT INFRINGEMENT IN 2016.

In September 2015, the FDA accepted Sandoz's application to market its etanercept biosimilar, ERELZI®. JA083. In February 2016, Amgen sued Sandoz for patent infringement, asserting five patents, including the '182 and the '522 patents. JA083; *see also Immunex Corp. v. Sandoz Inc.*, No. 16-cv-1118, 2018 WL 7254681, at *1 (D.N.J. Aug. 20, 2018). During the litigation, Amgen dropped the assertions of the other three patents and solely pursued its case based on the '182 and '522 patents. JA084.

At trial in September 2018, Sandoz argued the '182 and '522 patents were invalid for three reasons: (1) obviousness-type double patenting; (2) lack of written description and enablement; and (3) obviousness. *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 380–423 (D.N.J. 2019). The district court rejected all three validity challenges and, in October 2019, entered its final judgment enjoining Sandoz "from making, using, offering to sell, or selling within the United States, or importing into the United States any product containing etanercept." JA233. The Federal Circuit affirmed the district court's final judgment in July 2020. *Immunex Corp.*, 964 F.3d at 1068.

7

Sandoz's obviousness-type double patenting validity challenge received the most attention from the district court and Federal Circuit. "Obviousness-type double patenting is a judicially-created doctrine aimed at preventing claims in separate patents that claim obvious variants of the same subject matter where 'granting both exclusive rights would effectively extend the life of patent protection.' . . . The doctrine applies to all commonly-owned patents, even in cases where the obvious variants are invented by different inventors." *Immunex*, 964 F.3d at 1056 (citations omitted). Sandoz argued that through the 2004 Exclusive License, Amgen obtained common ownership of both Immunex's etanercept patents as well as Roche's overlapping patent rights in violation of the obviousness-type double patenting doctrine. *Immunex Corp.*, 395 F. Supp. 3d at 380–423; *Immunex Corp.*, 964 F.3d at 1059. Both the district court and Federal Circuit rejected this argument on the grounds that the 2004 Exclusive License "did not transfer all substantial rights in the patents-in-suit to" Amgen because Roche had maintained a "secondary right to sue if Immunex fail[ed] to rectify any infringement within 180 days after written request by Roche" and maintained a "right to veto the assignment of Immunex's interest under the agreement to any unrelated party," so the '182 and '522 patents were "not 'commonly owned,' and obviousness-type double patenting does not apply." *Immunex*, 964 F.3d at 1061, 1063; *see also id.* at 1056 (noting that the district court found that "the patents-in-suit and the asserted double-patenting reference patents

8

are not commonly owned").

### III.  SANDOZ SUES AMGEN FOR ILLEGALLY MAINTAINING ITS MONOPOLY OVER THE U.S. ETANERCEPT MARKET IN 2025.

In April 2025, Sandoz filed the instant suit against Amgen, alleging violations of Section 2 of the Sherman Act for Amgen's knowing, willful, and improper maintenance of its monopoly in the U.S. market for etanercept and related state law claims. JA101. Sandoz provided detailed factual allegations explaining how Amgen violated Section 2 of the Sherman Act by acquiring duplicative patent rights from Roche related to etanercept—a drug over which it already had a monopoly in the United States. JA265–266. Amgen's later prosecution and enforcement of those patent rights resulted in antitrust injury. JA265–266. While the prosecution and enforcement of patent rights may not create antitrust liability under the *Noerr-Pennington* doctrine, that doctrine does not immunize all predicate conduct—*e.g.*, a monopolist's acquisition of patent rights—from antitrust liability. JA266–267. Indeed, in a separate antitrust case against Amgen, the lower court agreed with this distinction between conduct creating antitrust *liability* and antitrust *injury*. *See* Dkt. 66 at 28–29, 34–36, *CareFirst of Md., Inc. v. Amgen, Inc.*, No. 24-cv-484-AWA (E.D. Va. Sept. 30, 2025).[2]

---

[2] This decision is now on appeal before the Fourth Circuit. Dkt. 97, *CareFirst of Md., Inc. v. Amgen, Inc.*, No. 24-cv-484-AWA (E.D. Va. Mar. 18, 2026); *see also CareFirst of Md., Inc. v. Amgen, Inc.*, No. 26-1473 (4th Cir.).

Sandoz's complaint alleged significant antitrust injury flowing from the exclusion of biosimilar competition in the U.S. etanercept market. After obtaining a permanent injunction against biosimilar competition from Sandoz,[3] Amgen raised the price of ENBREL® *dozens* of times, most recently in January 2024. Amgen has grossed nearly $90 billion in ENBREL® sales to date. JA087–088. Amgen also entered anticompetitive cross-therapeutic rebate bundling arrangements involving ENBREL®, at least as recently as January 1, 2022, to place its products in favorable formulary positions with third-party payors. JA093–094. Amgen's practice of leveraging bundled rebates across its broad product portfolio to "gain advantages over potential rivals" was condemned by the FTC as entrenching Amgen's products with payors who cannot afford to forego Amgen's lucrative bundled rebates—often offered on all-or-nothing terms—thus limiting a competitor's chances to gain uptake in the market, even once able to launch competing products. JA093–094. And just last year, a jury found that Amgen was a monopolist in the etanercept market and that its cross-therapeutic bundling practices violated the Sherman Act. JA261–262.

Despite these allegations, which include conduct undertaken by Amgen after the parties' 2016 patent litigation, the district court dismissed Sandoz's federal antitrust claim on the ground that Sandoz was required to bring it as a compulsory

---

[3] Amgen likewise obtained an injunction against Samsung's commercialization of another etanercept biosimilar. JA087–088.

counterclaim in the 2016 patent litigation under Federal Rule of Civil Procedure 13(a). JA018–031.[4] Specifically, the lower court found substantial overlap between Sandoz's obviousness-type double patenting defense in the 2016 patent litigation and the instant antitrust claim. JA024–025, JA030–031. The lower court erred as a matter of law and must be reversed.

---

[4] Having dismissed Sandoz's sole claim under federal law, the court then dismissed Sandoz's state law claims for lack of jurisdiction. JA031–032.

## SUMMARY OF ARGUMENT

Federal Rule of Civil Procedure 13(a) requires a party to raise as a counterclaim "any claim that—at the time of its service—the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." The lower court found Sandoz's *antitrust* claim must have been raised as a compulsory counterclaim in response to *patent infringement* claims brought by Amgen in prior litigation. This Court should reverse that ruling for at least two reasons.

First, binding Supreme Court precedent requires finding that Sandoz's antitrust claim is a permissive—not compulsory—counterclaim to Amgen's 2016 patent infringement suit. *See Mercoid*, 320 U.S. at 670–71 (holding that an antitrust claim was a permissive counterclaim under Rule 13(b) in response to a claim of patent infringement). Even if this Court, like the lower court, applies *Mercoid* as a narrow exception to Rule 13(a), that exception squarely applies here because Sandoz's antitrust claim is *not* "based upon alleged patent *invalidity*." JA030. Sandoz's interpretation and application of *Mercoid* and the compulsory counterclaim rule is consistent with and respects Congress's clear policy preference of allowing patent and antitrust claims to be tried separately.

Second, the lower court misapplied this Circuit's "four inquiries" used as "guideline[s]" for lower courts in determining if a counterclaim is compulsory:

12

> (1) Are the issues of fact and law raised in the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? and (4) Is there any logical relationship between the claim and counterclaim?

*Painter v. Harvey*, 863 F.2d 329, 331 (4th Cir. 1988). Here, the district court found that the final three "of the above inquiries weigh in favor of finding that Sandoz's present antitrust claim was a compulsory counterclaim" in the 2016 patent litigation. JA028. The court then rejected application of the Supreme Court's *Mercoid* "exception," finding that *Mercoid* has been cabined to its facts and does not apply here because Sandoz's antitrust claims are purportedly based on patent invalidity instead of patent misuse. JA028–031.

The lower court's reasoning relied entirely on nominal similarities between Sandoz's obviousness-type double patenting ***defense*** in the 2016 patent litigation and the alleged antitrust violation. However, Rule 13(a) and this Circuit's four inquiries speak to overlap between the ***claim*** (patent infringement) and the ***counterclaim*** (a Section 2 violation). Courts have found that a defense raised in earlier litigation is not the proper reference point for application of the compulsory counterclaim rule. Even setting that aside, this Circuit's four inquiries—when correctly applied in light of *Mercoid*—support finding that Sandoz's antitrust claim was permissive, not compulsory.

13

## STANDARD OF REVIEW

This Court reviews a district court's order on a motion to dismiss *de novo*. *Roberts v. Carter-Young, Inc.*, 131 F.4th 241, 249 n.3 (4th Cir. 2025) (vacating and remanding district court order dismissing complaint); *see also Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 298 (4th Cir. 2003) ("We review a district court's finding that a counterclaim is compulsory de novo."). To survive a motion to dismiss, the complaint "must contain sufficient facts to state a claim to relief that is plausible on its face." *Roberts*, 131 F.4th at 249 n.3 (citation modified). The district court, in ruling on a motion to dismiss, "must accept as true all of the factual allegations contained in the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citation omitted). And all reasonable inferences are drawn in favor of the plaintiff. *Id.*

14

## **ARGUMENT**

**I.    THE DISTRICT COURT IMPROPERLY APPLIED THE SUPREME COURT'S HOLDING IN *MERCOID.***

**A. The Supreme Court's binding *Mercoid* decision requires finding that Sandoz's antitrust claim is a permissive counterclaim.**

In *Mercoid Corp. v. Mid-Continent Investment Co.*, the Supreme Court determined that an antitrust claim was a permissive counterclaim under Rule 13(b) in response to a claim of patent infringement. 320 U.S. at 670–71. There, in a prior action, Mid-Continent sued Mercoid's customer for patent infringement. Mercoid was not a defendant in that suit, but it controlled its customer's defense. *Id.* at 669. Later, Mid-Continent sued Mercoid for contributory infringement of the same patent and, in response, Mercoid filed an antitrust counterclaim. The lower courts found that because Mercoid provided the defense for its customer in the earlier infringement suit, it was bound by *res judicata* as to "all issues which might have been raised in that earlier suit," including "the violations of the anti-trust laws." *Id.* The Supreme Court reversed and squarely held that even if:

> Mercoid were barred in the present case from asserting any defense which might have been interposed in the earlier litigation, it would not follow that its counterclaim for damages would likewise be barred. That claim for damages is more than a defense; it is a separate statutory cause of action. The fact that it ***might have been asserted*** as a counterclaim in the prior suit ***by reason of Rule 13(b)*** of the Rules of Civil Procedure . . . does not mean that the failure to do so renders the prior judgment res judicata as respects it.

*Id.* at 671 (emphasis added).

Subsequent courts have recognized the clear and binding force of this precedent. *See Tank Insulation Int'l, Inc. v. Insultherm, Inc.*, 104 F.3d 83, 88 (5th Cir. 1997) ("[T]he Court plainly held that the antitrust counterclaim was permissive . . . . [I]t is clear that the Court specifically considered rule 13's application . . . and expressly and unambiguously held that the counterclaim was permissive. Such a holding is an express holding that the counterclaim was not compulsory because under rule 13 a counterclaim is either compulsory or permissive—it cannot be both." (footnote omitted)); *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536 (9th Cir. 1995) ("*Mercoid* leaves open the possibility of raising antitrust claims as permissive counterclaims in an infringement action, or in a separate and subsequent action."); *Agrashell, Inc. v. Hammons Prods. Co.*, 479 F.2d 269, 287 (8th Cir. 1973) (finding that *Mercoid* "controlled" and rendered a subsequent Section 1 claim a "permissive, not compulsory, counterclaim"); *Fowler v. Sponge Prods. Corp.*, 246 F.2d 223, 227 (1st Cir. 1957) ("[T]he Supreme Court has clearly stated that a counterclaim for treble damages is permissive in nature so that failure by a defendant to plead it in a prior patent suit does not bar a subsequent independent suit by him under the antitrust laws."); *P & M Servs., Inc. v. Gubb*, No. 07-cv-12816, 2008 WL 4185903, at *5 (E.D. Mich. Sept. 8, 2008) ("[T]he Court must accept the ruling of *Mercoid*, and find that the antitrust claim by P & M Services is not barred by the previous patent

16

infringement lawsuit.").[5]

This binding authority requires reversal of the lower court's order. Sandoz, like Mercoid, alleged an antitrust violation in a separate case following final adjudication of a prior patent infringement suit involving the same patent(s). Sandoz, like Mercoid, "might have . . . asserted as a counterclaim" the antitrust violation "in the prior suit by reason of Rule 13(b)," but did not do so. *Mercoid*, 320 U.S. at 671. Accordingly, Sandoz's antitrust claim, like Mercoid's antitrust counterclaim, must be viewed as permissive and capable of being litigated in the subsequent action. *See Zero Techs.*, 713 F. Supp. 3d at 55, 72–73 (finding that an antitrust claim based on a theory of patent ambush and abuse of standard setting was not a compulsory counterclaim to an infringement suit); *Amphastar Pharmas., Inc. v. Momenta Pharmas, Inc.*, 297 F. Supp. 3d 222, 231 (D. Mass. 2018) (finding that a prior "patent case does not bar a subsequent independent suit under the antitrust laws" because "the Court is bound by" *Mercoid* and later First Circuit authorities).

**B. The district court's effort to cabin *Mercoid* relied on erroneous understandings of both prior Fourth Circuit precedent and Sandoz's antitrust claim.**

Notwithstanding the bevy of authority applying *Mercoid*'s straightforward

---

[5] To be sure, this Court recognized *Mercoid*'s impact on traditional principles of *res judicata* shortly after that case was decided. *See Stanback v. Robertson*, 183 F.2d 889, 892 (4th Cir. 1950) (citing *Mercoid* for the proposition that "where [a] second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly").

legal holding, the district court maintained that *Mercoid* has been "interpreted []

narrowly," including by the Fourth Circuit in *Burlington Industries v. Milliken &*

*Co.*, 690 F.2d 380 (4th Cir. 1982). The district court then applied an artificially

narrow interpretation of *Mercoid* based on its misreading of *Burlington* and based

on a Second Circuit case that if applied correctly, ***supports*** Sandoz's appeal.

### 1. This Court's prior holding in *Burlington* requires application of *Mercoid* to the instant dispute.

In *Burlington*, this Court held, *inter alia*,[6] that the filing of a claim by a

plaintiff tolls the statute of limitations for a compulsory counterclaim. 690 F.2d at

388–89. In so holding, this Court analyzed whether antitrust counterclaims asserted

by two defendants—Burlington and Madison—in two separate cases were

compulsory counterclaims. Crucially, this Court's finding that those antitrust

counterclaims were compulsory rested on the fact that the predicate claim was for

"breach of [a] license agreement"—not patent infringement—so "the district court

---

[6] This Court listed the seven issues in *Burlington* as: (1) whether the district court properly applied the measure of damages and correctly excluded defendants' proffered evidence; (2) whether defendants should have been permitted to prove plaintiffs participated in a price-fixing conspiracy at the damages phase of the trial; (3) whether plaintiffs were estopped from recovering royalty-based damages because of their role in other litigation; (4) whether the district court properly applied the statute of limitations to plaintiffs' antitrust claims; (5) whether a plaintiff could recover damages sustained by one of its subsidiaries with which it merged during the litigation; (6) whether the district court erred in calculating the value of certain services defendants provided to plaintiff; and (7) whether the district court erred in recognized a certain defense. *Burlington*, 690 F.2d at 383. Notably, none directly concern *Mercoid* or compulsory counterclaims under Rule 13(a).

18

was correct in its ruling" that "Burlington's and Madison's antitrust claims against DMRC ***arose out of the very transaction which was the subject matter of DMRC's complaint—namely, the licensing agreement imposed by DMRC***." *Id.* at 389 (emphasis added). This Court emphasized that *Mercoid* was "distinguishable" because, unlike the complaint in *Burlington*, the complaint was "for patent infringement" and "did not demand a declaratory judgment on the issue of the enforceability of the patents or of any license agreement under which those patents were licensed." *Id.* In the Fourth Circuit's view, the antitrust counterclaims were compulsory in response to the breach-of-license claims, and the district court correctly "held that Burlington's and Madison's antitrust claims related back to the dates of DMRC's respective complaints" and correctly permitted those counterclaimants "to recover for the period beginning four years prior to" the dates of the respective complaints. *Id.*

Notwithstanding this context, the district court interpreted *Burlington* as "the Fourth Circuit treat[ing] an antitrust claim as a compulsory counterclaim, finding that it should have been raised in a prior patent infringement case between the parties." JA030. That is wrong for two plain reasons.

***First***, the *Burlington* Court addressed *Mercoid* only to determine whether the district court correctly ruled that the counterclaimants were entitled to recover all damages from the four years preceding the filing of the plaintiff's breach-of-license

19

claims because the antitrust counterclaims were compulsory and therefore "related back to the dates of [the] respective complaints." 690 F.2d at 389. The *Burlington* Court did not directly address Rule 13(a), this Circuit's tests for identifying compulsory counterclaims, or whether an antitrust claim is (or ought to be) treated as a compulsory counterclaim in response to a patent infringement claim.

At best, the district court here can cite only *dicta* that *Mercoid* "has been read narrowly" by other courts. *Burlington*, 690 F.2d at 389. But that *dicta* is not binding. *See Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) (stating that not "everything said in a panel opinion binds future panels" and that "dictum is not binding"). And district courts are not free to disregard binding Supreme Court precedent simply because out-of-circuit authority (relied on by the *Burlington* panel) has concluded— without support from the Supreme Court itself—that the precedent is limited to its facts. *See id.* ("[A]s an inferior court, the Supreme Court's precedents do constrain us."). In any event, that *dicta* does not resolve whether Sandoz's antitrust claim *must* have been brought as a counterclaim in response to Amgen's 2016 patent infringement litigation. In fact, this Court's understanding of *Mercoid* suggests that Sandoz's claim must be considered permissive. *See Burlington*, 690 F.2d at 389 ("Justice Douglas's opinion in that case treated antitrust and patent misuse claims as merely permissive counterclaims in response to a complaint for patent infringement.").

20

*Second*, the district court misread *Burlington*. The district court suggested that the Fourth Circuit "[found] that [an antitrust claim] should have been raised in a prior patent infringement case between the parties." JA030. Not so. In *Burlington*, the counterclaimants brought antitrust counterclaims in response to the plaintiff's allegations of "breach of its license agreement." 690 F.2d at 389. This court could not have found that those antitrust counterclaims "should have been raised in a prior patent infringement case" because they ***were*** in fact raised in response to a ***breach-of-license*** claim—not in a prior patent infringement case. JA030. This error undermines the district court's decision: the Fourth Circuit found that *Mercoid* did "not require a different conclusion" in *Burlington* because the plaintiff there brought a claim related to "the licensing agreement," not a claim "for patent infringement." 690 F.2d at 389. Indeed, this Circuit recognized *Mercoid*'s holding that antitrust claims are "merely permissive counterclaims in response to a complaint for patent infringement." *Id.* That holding squarely applies here.

### 2. This Court also incorrectly applied Second Circuit authority.

The district court also erred in not applying *Mercoid* by relying on Second Circuit authority that artificially limited *Mercoid*'s holding. JA030–031. In *Critical-Vac Filtration Corp. v. Minuteman International, Inc.*, 233 F.3d 697 (2d Cir. 2000), the Second Circuit found that *Mercoid* "should be limited to the facts in that case" and proceeded to draw a line "between claims of patent *misuse* and claims of

21

patent *invalidity.*" *Id.* at 702–03. The Second Circuit held that *Mercoid* extended only to antitrust claims predicated on "misuse of a *valid* patent" but did not apply to antitrust claims predicated on attempts "to enforce an *invalid* [] patent." *Id.* at 703.

That distinction appears nowhere in *Mercoid*, and the Second Circuit recognized as much by relying on an academic article to support its invented justification.[7] *See id.* at 703–04. *Mercoid* did not elevate patent misuse claims above other patent claims as deserving of treatment as permissive counterclaims under Rule 13(b). The Court's reasoning instead emphasized the importance of allowing all patent disputes that may harm the public interest in competition to play out in courts, even if the rules of "private litigation" traditionally would not allow such disputes to proceed. *Mercoid*, 320 U.S. at 670. Recognizing this rationale from *Mercoid*, other courts have cast doubt on the distinction some courts have drawn between patent misuse and patent invalidity. *See Am. Equip. Corp. v. Wikomi Mfg. Co.*, 630 F.2d 544, 546 (7th Cir. 1980) ("To protect the public interest in free

---

[7] Further, the Second Circuit emphasized the plaintiff had "not now alleged any facts that arose after the filing of its answer in the [underlying] litigation." *Critical-Vac*, 233 F.3d at 700. Sandoz, in contrast, did allege new facts arising after the 2016 patent suit—Amgen's leveraging of its unlawful monopoly to bundle ENBREL® and OTEZLA®, an oral treatment for moderate-to-severe psoriasis, together. JA093. Indeed, a jury in the District of Delaware found Amgen liable for this conduct and returned a verdict against it for $406.8 million. *Regeneron Pharmas., Inc. v. Amgen Inc.*, No. 1:22-cv-00697, Dkt. 490 (D. Del. June 2, 2025). Those facts could not have been known to Sandoz at the time of the 2016 patent suit and further distinguish *Critical-Vac* from the instant case.

circulation of ideas, the doctrine of res judicata has been limited to assure that invalid patents are not used or valid patents misused to acquire monopoly power."). Accordingly, this Court should not follow the Second Circuit's path and artificially narrow the Supreme Court's express holding. *See Tank Insulation*, 104 F.3d at 88 ("[I]t is clear that the Court specifically considered rule 13's application to the question before it and expressly and unambiguously held that the counterclaim was permissive.").

Even if this Court adopts the Second Circuit's strained reading of *Mercoid*, that result would still require reversal of the district court's decision. After adopting the Second Circuit's distinction between antitrust claims based on patent misuse as opposed to patent invalidity, the district court found that "Sandoz's antitrust claim is not based upon patent *misuse* after a patent has been lawfully obtained. It is based upon alleged patent *invalidity*." JA030. That is incorrect.

Sandoz's theory of antitrust liability is predicated on Amgen's "unlawful acquisition" of Roche's patent applications that resulted in the '182 and '522 patents. JA022. Although the district court compared certain language and arguments Sandoz made in support of its obviousness-type double patenting validity challenge and its antitrust claim, JA025, Sandoz's antitrust claim is not "based upon" the (in)validity of the '182 and '522 patents. Instead, Sandoz's antitrust claim is that Amgen's acquisition of patent rights from Roche—regardless of their ultimate validity—

unlawfully extended its monopoly in violation of the Sherman Act. Accordingly, the Second Circuit's reasoning does not apply because Sandoz's antitrust claim does not rely upon, or even raise, the question of whether the '182 and '522 patents are valid.[8] *See Critical-Vac*, 233 F.3d at 704 ("[We] hold that the *Mercoid* exception to Rule 13(a) does not apply to antitrust claims that ***raise the issue of patent validity*** . . . . Because these [antitrust] claims ***rest on*** allegations of patent invalidity, they were compulsory counterclaims in the [] patent infringement litigation and, under Rule 13(a), should have been asserted there." (emphasis added)); *Zero Techns.*, 713 F. Supp. 3d at 72 n.30 (finding that even "if this court were to utilize [the Second Circuit's] distinction," the antitrust claim at issue was "more likely to be a 'patent misuse'" claim because it was not "necessary to litigate patent validity to answer the antitrust question").

---

[8] The most common antitrust claim predicated on patent invalidity is a *Walker-Process* claim. *See Zero Techs.*, 713 F. Supp. 3d at 72 n.29 ("A *Walker-Process* claim alleges an antitrust violation for patents that were procured by fraud on the Patent and Trademark Office ('PTO'). *Walker Process* claims involve a party that knowingly asserts a fraudulently procured patent in an effort to monopolize a market, and therefore, ***hinge on the patent being invalid*****.**" (emphasis added) (citation omitted) (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965))). Notably, the antitrust claim at issue in *Critical-Vac* was a *Walker-Process* fraud claim. *See Critical-Vac*, 233 F.3d at 700 ("C–Vac alleges that Minuteman intentionally deceived the Patent Office and knowingly tried to enforce an invalid patent by pursuing sham litigation against C–Vac[.]").

24

**C. The district court further erred by overriding crucial policy considerations *Mercoid* advances.**

The district court's decision fails to account for the important policy considerations inherent in *Mercoid*. Treating antitrust claims as permissive, rather than compulsory, counterclaims in patent infringement litigation (1) is consistent with prevailing concerns that lead to the reality that such claims are typically bifurcated and tried separately, (2) allows each regional circuit court to manage its precedents on antitrust law without ceding that role to the Federal Circuit, and (3) avoids inducing defendants in patent infringement suits from bringing unripe antitrust claims that have yet to accrue.

*First*, as recognized by the Federal Circuit, district courts regularly bifurcate trial of patent and antitrust claims because patent claims may be resolved sooner and separation avoids "prejudice and confusion" caused by "trying first the patent issues, without injecting the different [antitrust] counterclaim issues which require different proof and different witnesses." *In re Innotron Diagnostics*, 800 F.2d 1077, 1085 (Fed. Cir. 1986); *see also FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) ("[I]t is normally not necessary to litigate patent validity to answer the antitrust question (unless, perhaps, to determine whether the patent litigation is a sham)[.]" (citation omitted)). Further, the forced litigation of patent and antitrust claims in the same action would require parties to expend significant resources—while drawing on limited judicial resources—to resolve their disputes in one proceeding. The Federal

25

Circuit has acknowledged patent litigation is an "expensive and lengthy" process. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426 (Fed. Cir. 1988). Similarly, the Supreme Court has recognized the increasing expense and time required for antitrust litigation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (noting the high cost of antitrust discovery and cases). The district court's decision here, left uncorrected, would force parties to bring two types of costly claims together, burdening scarce judicial resources further and creating unruly dockets for district courts to manage.

To avoid the prejudice, confusion, and waste of judicial and party resources detailed above, courts routinely bifurcate antitrust claims in patent infringement suits. *Azurity Pharmas., Inc. v. Bionpharma Inc.*, 650 F. Supp. 3d 269, 276 (D. Del. 2023); *see also Hydranautics*, 70 F.3d at 536 ("In many cases even if the antitrust []claim were asserted by counterclaim, the court would sever the issues and resolve the infringement case first."); *Audio MPEG, Inc. v. Dell Inc.*, 254 F. Supp. 3d 798, 804 (E.D. Va. 2017) ("When applying [Rule 42(b)] to cases with patent claims and antitrust counterclaims, district courts frequently bifurcate the issues for trial."). The "common practice" of bifurcation thus "weighs against viewing the antitrust claims as compulsory counterclaims." *Azurity Pharms., Inc.*, 650 F. Supp. 3d at 276; *see also Zero Techns.*, 713 F. Supp. 3d at 68 (noting the fact "[p]atent claims and antitrust claims are often bifurcated for trial purposes or severed" was an illustration

26

of "the distinctiveness between patent and antitrust claims" supporting why "they need not be decided as a pair"); *Critical-Vac*, 233 F.3d at 703 (citing academic authority for the proposition that "[i]f patent infringement claims are frequently bifurcated from antitrust counterclaims and tried separately under Rule 42(b), it would seem that the same underlying logic would apply equally to Rule 13(a)" (citation omitted)).

***Second***, *Mercoid*'s holding that antitrust counterclaims are merely permissive honors Congress's purpose of providing "different appellate paths for those two kinds of actions." *Zero Techns.*, 713 F. Supp. 3d at 68 (noting that "appeals from patent infringement decisions go to the Federal Circuit, while appeals from antitrust decisions typically go to the regional circuit in which the district court sits"). If, as the lower court has suggested, antitrust counterclaims are compulsory in response to patent infringement claims, "then any appeal of the antitrust decision would go to the Federal Circuit, not the regional circuit," which "may generate a difference between the antitrust law generally applicable within each regional circuit, and antitrust law in [] patent infringement cases." *Hydranautics*, 70 F.3d at 536. Such a result would run counter to Congress's clear intent to provide different appellate paths for antitrust and patent claims.[9]

---

[9] Congress's intent is further underscored by the different venue statutes for antitrust and patent claims. *See Zero Techns.*, 713 F. Supp. 3d at 68 ("Congress has a specific

27

*Third*, treating antitrust claims as compulsory counterclaims in patent infringement litigation would force defendants to bring unripe antitrust claims that have yet to accrue or risk losing their ability to pursue antitrust claims in the patent infringement context altogether. An antitrust claim accrues on the date damages from the anticompetitive conduct are suffered. *See Go Comput., Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007) ("[An antitrust] cause of action generally accrues when a defendant commits an act that causes economic harm to a plaintiff." (citation omitted)). If a party must bring its antitrust claims as compulsory counterclaims in a patent dispute, the party faces the risk that its damages from the anticompetitive conduct will not have accrued yet. *See Azurity Pharms., Inc.*, 650 F. Supp. 3d at 277 ("The possibility that antitrust claims might not accrue until sometime after [] infringement litigation plays out suggests that they do not 'bear[ ] a logical relationship' to that infringement suit." (second alteration in original) (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978))).

A court faced with this accrual issue may rightfully dismiss the antitrust

---

venue statute for patent actions that applies more narrowly, while a more expansive venue provision applies to antitrust action."). The patent venue statute limits venue to the defendant's state of incorporation or where the alleged infringing acts were committed and the infringing party has a regular place of business whereas antitrust cases may be brought anywhere a defendant entity is an inhabitant, is found, or transacts business. *Id.* (first citing *TC Heartland LLC v. Kraft Foods Grp. Brands LLC,* 581 U.S. 258, 261 (2017), then citing 15 U.S.C. § 22).

28

counterclaim as premature or not yet ripe for lack of antitrust injury. *See id.* ("[I]f Azurity had prevailed in the First or Second Wave suits, Bionpharma could not allege it suffered an antitrust injury because Azurity would have lawfully kept Bionpharma off the market."). But the work required by courts to reach that result would (again) overburden already scarce judicial resources by flooding the courts with potentially unripe antitrust claims from almost every defendant in a patent infringement case faced with the risk of losing the ability to pursue those claims later on when damages have more clearly accrued. The Ninth Circuit recognized this dilemma and likened antitrust claims arising in this context to civil claims for malicious prosecution. *Hydranautics*, 70 F.3d at 537. Civil malicious prosecution claims cannot be asserted as a counterclaim in the underlying suit that is allegedly malicious because the underlying suit must first run its course before being used as a predicate for a subsequent, separate cause of action. So too here: the underlying patent dispute ordinarily should first be resolved before requiring a party's antitrust claim, where the alleged antitrust injury flows from the patent litigation, be brought as a cause of action. *See id.* ("*Mercoid* is consistent with this approach, and we see no reason to distinguish *Mercoid* from the case at bar.").

For these reasons, the lower court's finding that Sandoz's antitrust claim was a compulsory counterclaim in response to Amgen's patent infringement suit is both bad law and bad policy.

29

## II.   SANDOZ'S SECTION 2 CLAIM IS NOT A COMPULSORY COUNTERCLAIM.

This Court may reverse the lower court's ruling on the sole basis that *Mercoid* requires considering Sandoz's antitrust claim as a permissive, rather than compulsory, counterclaim. However, this Court may also reverse the lower court's ruling for erroneously applying this Circuit's four inquiries used to determine whether a counterclaim is compulsory under Rule 13(a). First, the lower court improperly relied solely on Sandoz's obviousness-type double patenting ***defense***—not Amgen's patent infringement claims—to conclude that Sandoz's antitrust claim arose out of the same "transaction or occurrence" as Amgen's 2016 patent infringement claims. Fed. R. Civ. P. 13(a). Second, this Circuit's four inquiries, when applied properly, also support a finding that Sandoz's antitrust claim was not a compulsory counterclaim.

### A. The district court improperly relied solely on Sandoz's obviousness-type double patenting defense when applying Rule 13(a).

Rule 13(a) asks whether the claim—here, Sandoz's Section 2 claim—"arises out of the transaction or occurrence that is the subject matter of the opposing party's ***claim***"—here, Amgen's patent infringement claims. When applying this Circuit's four inquiries, the district court ***never*** compared the facts, law, or evidence underlying Amgen's patent infringement claim to the facts, law, or evidence underlying Sandoz's antitrust claim as pleaded. JA024–028. Instead, the court

30

consistently compared Sandoz's antitrust claim to its prior obviousness-type double patenting defense it raised in the 2016 patent litigation. *See, e.g.*, JA025 ("In that case, as here, Sandoz argued, *inter alia*, that the '182 and '522 Patents should be invalidated because Amgen had used the patents to obtain an 'unjustified timewise extension of its etanercept monopoly.'"); JA026 ("[T]he Court finds that substantially the same evidence presented in the *Amgen v. Sandoz* Case—to demonstrate that the patents were obtained in violation of patent law—would be presented in this case to show that the patents were obtained in violation of antitrust law.").

Plainly, the evidentiary burden Amgen had to satisfy for its patent infringement claims bears little resemblance to Sandoz's evidentiary burden for its antitrust claim. *See infra* Section II.B.1. Numerous courts have found that—in such circumstances—a court cannot rely solely on a defense raised in the earlier litigation as a basis for finding that a later filed claim was a compulsory counterclaim. *See, e.g.*, *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1326 (Fed. Cir. 2008) ("In each of the three tests for what constitutes the same 'transaction or occurrence,' the question is the extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its counterclaim. The mere possibility that, as a result of affirmative defenses, the first suit might involve additional issues does not obligate the defendant to assert those affirmative

31

defenses as a counterclaim."); *Zero Techns.*, 713 F. Supp. 3d at 71 ("[C]ourts have indicated that potential defenses to a matter are not relevant for purposes of the compulsory counterclaim rule."); *Va. Polytechnic Inst. & St. Univ. v. Hokie Real Est., Inc.*, 813 F. Supp. 2d 745, 753 n.2 (W.D. Va. 2011) ("Hokie Real Estate contends that the court should also consider any similarities between its counterclaims and its own affirmative defenses. However, as Rule 13(a) and *Painter* make clear, the determination of whether a defendant's counterclaims are compulsory hinges on whether the plaintiff's claims and the defendant's counterclaims arise out of the same transaction or occurrence."); *Frank N. Magid Assocs., Inc. v. Marrs*, No. 16-CV-198, 2017 WL 3097257, at *6 (N.D. Iowa July 20, 2017) ("Any assertion that the Shepherd Agreement is overly broad relates to Shepherd's defenses, rather than to Magid's claims. Shepherd's defenses cannot serve as the basis for a compulsory counterclaim."); *Gloucester T'ship Bd. Educ. v. E.N. ex rel. A.N.*, No. 22-cv-6568, 2025 WL 2926831, at *3 (D.N.J. Feb. 21, 2025) ("[T]hough Defendants may challenge Count II by asserting defenses, making affirmative showings, and/or relying on the sufficiency of its claims in the underlying action . . . the possibility that these matters might conceivably overlap in some abstract way with the proofs required for Plaintiff to prevail . . . does not *ipso facto* obligate Defendants to assert their causes of action as counterclaims."). Because the lower court relied solely on Sandoz's obviousness-type double-

32

patenting defense when applying this Circuit's four inquiries, this Court should reverse the lower court's finding that Sandoz's antitrust claim "arises out of the transaction or occurrence that is the subject matter of the opposing party's ***claim***." Fed. R. Civ. P. 13(a) (emphasis added).

**B. This Circuit's four inquiries all support finding that Sandoz's antitrust claim was not a compulsory counterclaim.**

### 1. The issues of fact and law are not largely the same.

This Circuit's first inquiry asks whether "the issues of fact and law raised in the claim and counterclaim [are] largely the same." *Painter*, 863 F.2d at 331. The lower court correctly concluded that the issues of *law* raised in the 2016 patent infringement litigation and instant antitrust case are "somewhat different." JA025. However, the district court concluded that the *facts* raised in this case and the 2016 patent litigation "are largely the same" because the factual background section of Sandoz's antitrust Complaint and the "Background section" of the prior court's infringement decision were "strikingly similar." JA024, JA027. That is insufficient to show the facts raised are "largely the same."

Amgen's claim that Sandoz's etanercept biosimilar infringed the '182 and '522 patents plainly raises different facts than Sandoz's antitrust claim. The district court concluded that there was a factual overlap because both the obviousness-type double patenting defense and antitrust claim nominally aver that Amgen obtained an "unjustified timewise extension" of its patent-protected monopoly. JA025. As noted

33

above, that finding is unsound because it focuses solely on Sandoz's prior ***defense***, not Amgen's ***claim*** of patent infringement.

Even considering Sandoz's obviousness-type double patenting challenge, the existence of one overlapping policy objective between that doctrine and the Sherman Act does not refute that the relevant facts necessary to ***prove*** each legal argument are exceedingly different. To prove obviousness-type double patenting, Sandoz had to show Amgen's common ownership of "patents that claim obvious variants of the same subject matter" and that this common ownership would "effectively extend the life of patent protection." *Immunex Corp.*, 964 F.3d at 1056. The district court rejected Sandoz's defense for several reasons:

> (1) that Sandoz's proposed test for common-ownership does not apply; (2) even if that test applies, the patents-in-suit and the asserted double-patenting reference patents are not commonly owned; (3) even if they are commonly owned, the two-way, rather than the one-way test for obviousness-type double patenting applies as to some of the double-patenting references; and (4) the patents-in-suit are patentably distinct from each of the asserted double patenting references.

*Id.* at 1056–57. Based on the foregoing, the facts raised by Sandoz's defense pertained to whether Amgen "owned" the '182 and '522 patents under the 2004 Exclusive License and whether the asserted claims in those patents were "patentably distinct" from reference patent claims owned by Amgen.

In contrast, Sandoz's antitrust claim requires proof of two very different elements: that (1) Amgen "possessed monopoly power in a relevant market" and

34

(2) Amgen "willfully acquired or maintained that power." *Mayor & City Council of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 129–30 (4th Cir. 2021). That claim focuses on the "economic realities" of the market power Amgen gained with the 2004 Exclusive License and ultimately exercised in the 2016 patent litigation and later. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189 (3d Cir. 2005) ("The Supreme Court . . . has emphasized that economic realities rather than a formalistic approach must govern review of antitrust activity."). The underlying facts presented in the prior litigation related to whether Amgen "owned" the '182 and '522 patents and whether the asserted claims in those patents were "patentably distinct" are irrelevant to Sandoz's current antitrust claim.

The only overlap in facts relates to the existence of the 2004 Exclusive License but, even then, the inquiries raised in each litigation are far different. In the 2016 patent litigation, the question was whether the 2004 Exclusive License effectively granted Amgen "ownership" of the '182 and '522 patents under patent law's "all substantial rights" test. *Immunex Corp.*, 964 F.3d at 1057–63. That factual question is irrelevant to Sandoz's antitrust theory, which instead focuses on whether the 2004 Exclusive License enabled Amgen to exert market power in the U.S. etanercept market. A sole factual overlap is insufficient to satisfy this Circuit's standard for a compulsory counterclaim under the first inquiry. *See Williams v. Long*, 558 F. Supp. 2d 601, 603–04 (D. Md. 2008) (finding that breach of contract, breach

35

of fiduciary duty, and invasion of privacy were not compulsory counterclaims to a claimed FLSA violation where "[t]he only issue that arises in both the claims and counterclaims is whether plaintiff [] was an employee (as plaintiffs allege) or a joint venture partner (as defendant alleges)").

### 2. *Res judicata* **does not bar Sandoz's antitrust claim.**

The lower court concluded that "this factor weighs in favor of finding that the present antitrust claim was a compulsory counterclaim in the" 2016 patent litigation because the judgment that the '182 and '522 patents were valid and infringed was a final judgment between the same parties that "deal[s] with the same subject-matter" because both suits "allege the same wrongful act": an illegal monopoly. JA025–026. This reasoning is flawed for several reasons.

*First*, the Supreme Court expressly rejected this rationale in *Mercoid*. *See* 320 U.S. at 671 ("The fact that [an antitrust claim] might have been asserted as a counterclaim in the prior suit by reason of Rule 13(b) . . . does not mean that the failure to do so renders the prior judgment res judicata as respects it."). That holding alone should resolve this factor.

*Second*, even this Circuit's reasoning in *Burlington* is in accord. There, the defendant argued that one of the plaintiff's (Burlington's) orchestration of a settlement that resulted in a consent decree acknowledging the validity of certain patents did not "estop[]" Burlington "from arguing that the patents were misused in

36

a subsequent antitrust violation." *Burlington*, 690 F.2d at 388. The same reasoning applies here: Amgen and Sandoz's litigation of the validity of the '182 and '522 patents does not bar Sandoz from later asserting that those valid patents were illegally obtained and have been used, in concert with other conduct, to perpetuate an illegal monopoly in the U.S. market for etanercept.

*Third*, the decisive prong of the *res judicata* inquiry at issue here asks whether the second claim arises out of the same transaction as the claim resolved by the prior judgment and therefore could have been brought in the original suit. *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210 (4th Cir. 2013). For reasons stated above, Sandoz's antitrust claim could not have been brought earlier because its antitrust injury and accompanying damages flowing from Amgen's anticompetitive acquisition of the patent rights resulting in the '182 and '522 patents had yet to accrue. *Supra* Section I(C).

### 3. Different evidence will be used to support or refuse Sandoz's antitrust claim.

The district court concluded "this factor weighs in favor of finding that [Sandoz's antitrust claim] was a compulsory counterclaim in the" 2016 patent litigation because "[t]he purchase of the Roche Patent Rights in 2004 is really at the heart of this case" and "[t]he lawyers who were involved in drafting and negotiating the related agreements, and then prosecuting those patent applications before the PTO, would presumably be called to testify in this case to offer any procompetitive

37

defense to Sandoz's antitrust claims." JA026–027. That reasoning is also flawed.

The evidence required to prove Sandoz's antitrust claim is far different from the evidence required for Amgen's patent infringement claims and Sandoz's obviousness-type double patenting defense. The district court here assumed that "lawyer-witnesses" who drafted the 2004 Exclusive License and who prosecuted the '182 and '522 patents would testify in this case, but that is not so. The testimony considered in the prior patent litigation related to whether the 2004 Exclusive License established "common ownership" and whether the '182 and '522 patents contained "patentably distinct" claims from reference patents owned by Amgen. *Immunex Corp.*, 395 F. Supp. 3d at 408–23. That testimony related to the patents' *validity*.

Sandoz's antitrust claims are unlikely to call for similar—let alone "substantially the same"—evidence. Instead, Sandoz's antitrust claims will focus on whether Amgen's acquisition of patents from Roche for its etanercept drug constituted unlawful maintenance of its monopoly power in the U.S. etanercept market. Whether the '182 and '522 patents are valid is wholly irrelevant to this antitrust claim. Accordingly, this factor strongly weighs against treating Sandoz's antitrust claim as a compulsory counterclaim. *See Painter*, 863 F.2d at 332 ("The 'same evidence' test thus accomplishes the purposes of [Rule] 13(a), because the very purpose of making certain types of counterclaims compulsory is to prevent the

38

relitigation of the same set of facts." (citation modified)).

### 4. Sandoz's antitrust claim and Amgen's patent infringement claim are not logically related.

The district court concluded that it would have been judicially efficient to try Sandoz's antitrust claim as a compulsory counterclaim in the 2016 patent litigation because of "the duplicative facts and evidence." JA027–028. But there is little factual or evidentiary overlap between Amgen's patent infringement claims and Sandoz's antitrust claims beyond mere background information. The district court's conclusion overlooks that antitrust claims typically require complex testimonial evidence from expert economists regarding market definition, market power, and anticompetitive effects that would have unnecessarily complicated the 2016 patent infringement litigation. Given that, it is unsurprising that antitrust counterclaims— when asserted in patent infringement litigation—are frequently bifurcated for separate consideration. *Supra* Section I(C); *Audio MPEG, Inc.*, 254 F. Supp. 3d at 804 ("When applying [Rule 42(b)] to cases with patent claims and antitrust counterclaims, district courts frequently bifurcate the issues for trial."); *Innotron Diagnostics*, 800 F.2d at 1085 (noting that simultaneous trial of antitrust counterclaims can result in "prejudice and confusion" caused by "trying first the patent issues" alongside antitrust "counterclaim issues which require different proof and different witnesses"). That practical reality alone suggests no "logical relationship" exists between Amgen's patent infringement claims and Sandoz's

antitrust claim.

Thus, the district court erred in applying this Circuit's four inquiries for determining whether a claim is a compulsory counterclaim.

## CONCLUSION

For these reasons, this Court should reverse the district court's order dismissing Sandoz's complaint and remand for further proceedings.

## STATEMENT REGARDING NECESSITY OF ORAL ARGUMENT

Counsel for Sandoz respectfully request oral argument. This case raises important issues regarding Rule 13's applicability and this Circuit's application of binding Supreme Court precedent interpreting Rule 13's application to antitrust claims raised in patent suits. Counsel for Sandoz submits that oral argument will assist this Court's decisional process—particularly its evaluation of the factual record and previous patent suit. *See* Fed. R. App. P. 34(a).

40

Dated: April 28, 2026                    Respectfully submitted,

                                            */s/ Matthew D. Kent*
                                                Matthew D. Kent
                                                Troy A. Stram
                                                Karla M. Doe
                                                **ALSTON & BIRD LLP**
                                                1201 West Peachtree St.
                                                Atlanta, GA 30309
                                                (404) 881-7000
                                                matthew.kent@alston.com
                                                troy.stram@alston.com
                                                karla.doe@alston.com

                                            *Counsel for Appellant Sandoz Inc.*

41

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. 32(a)(7)(B)(i) because it contains 9,132 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Times New Roman Font.

*/s/ Matthew D. Kent*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April 2026, a true and correct copy of

the foregoing Brief was served on all counsel of record in this appeal via CM/ECF.


*/s/ Matthew D. Kent*